IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| IN RE AURORA DAIRY CORP. ORGANIC MILK MARKETING AND SALES PRACTICES LITIGATION | Civil Action No.: 4:08-md-01907-ERW |
| This Filing Relates To:<br><br>ALL CASES | Judge E. Richard Webber |

## PLAINTIFFS' RESPONSE TO OBJECTIONS

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ......................................................................................................1

II.     BACKGROUND ........................................................................................................1

        A.      Despite Nationwide Notice Only Three Objections Were Submitted ...................1

        B.      Mr. Weinstein and Mr. Palmer Are Professional Objectors, Raising Serious
                Concerns Regarding the Legitimacy of their Objections Here ..............................2

III.    ARGUMENT .............................................................................................................4

        A.      The Objections to Class Certification Fail...........................................................4

                1.      The class definition is adequate and understandable. ..................................4

                2.      The Notice is adequate...............................................................................13

                3.      The class representatives are adequate, meeting Rule 23(a)(4)'s
                        requirements...............................................................................................15

                4.      The settling parties have met their burden of proof...................................17

        B.      The Objections to the Fairness of the Settlement Likewise Fail ..........................18

                1.      An objection that Plaintiffs might receive a better result at trial
                        misconstrues the inquiry courts make at final approval..............................18

                2.      The injunctive relief is far from illusory....................................................19

                3.      The Objectors' attack on the *cy pres* provision fails.................................22

                4.      Proof of purchase requirements, with caps on awards for those
                        lacking flexible evidence, are permissible. ................................................30

        C.      The Objections to the Requested Reasonable Attorneys' Fees Fail .....................31

        D.      Miscellaneous Procedural Issues ........................................................................33

                1.      The Palmer Objections are deficient under plain language of
                        Court's order. .............................................................................................33

                2.      Mr. Palmer is not fit to appear before the Court. .......................................34

IV.     CONCLUSION.........................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980)..............................................................................................................31

*Bouaphakeo v. Tyson Foods, Inc.*,
    564 F. Supp. 2d 870 (N.D. Iowa 2008)..............................................................................15

*DeBoer v. Mellon Mortg. Co.*,
    64 F.3d 1171 (8th Cir. 1995) ..............................................................................................16

*DeBremaecker v. Short*,
    433 F.2d 733 (5th Cir. 1970) ................................................................................................7

*Dennis v. Kellogg Co.*,
    697 F.3d 858 (9th Cir. 2012) ..............................................................................................29

*Downes v. Bidwell*,
    182 U.S. 244 (1901)............................................................................................................13

*F.C.V., Inc. v. Sterling Nat'l Bank*,
    652 F. Supp. 2d 928 (N.D. Ill. 2009) ................................................................................7, 8

*Flores v. Anjost Corp.*,
    284 F.R.D. 112 (S.D.N.Y. 2012) ..........................................................................................5

*Grove v. Principal Mut. Life Ins. Co.*,
    200 F.R.D. 434 (S.D. Iowa 2001) ......................................................................................19

*Guschausky v. American Family Life Assur. Co.*,
    851 F. Supp. 2d 1252 (D. Mont. 2012)..............................................................................32

*Heekin v. Anthem, Inc.*,
    No. 1:05-CV-01908-TWP-TAB, 2012 WL 5472087 (S.D. Ind. Nov. 9, 2012)....................29

*Holden v. Burlington N. Inc.*,
    665 F. Supp. 1398 (D. Minn. 1987)....................................................................................26

*In re Airline Ticket Comm'n Antitrust Litig.*,
    307 F.3d 679 (8th Cir. 2002) ..............................................................................................28

*In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices Litig.*,
    621 F.3d 781 (8th Cir. 2010) ..............................................................................................18

*In re BankAmerica Corp. Secs. Litig.*,
    210 F.R.D. 694 (E.D. Mo. 2002) ........................................................................................26

*In re Checking Account Overdraft Litig.*,
   830 F. Supp. 2d 1330 (S.D. Fla. 2011) ........................................................3, 18, 26

*In re Chrysler Motors Corp. Overnight Evaluation Program Litig.*,
   736 F. Supp. 1007 (E.D. Mo. 1990) ........................................................................31

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
   851 F. Supp. 2d 1040 (S.D. Tex. 2012) ..................................................................27

*In re Initial Pub. Offering Sec. Litig.*,
   728 F. Supp. 2d 289 (S.D.N.Y. 2010).......................................................................3

*In re Lupron Mktg. & Sales Practices Litig.*,
   677 F.3d 21 (1st Cir. 2012), *cert. denied*, 133 S. Ct. 338,
   184 L. Ed. 2d 239 (U.S. 2012) ................................................................................27

*In re Oil Spill*,
   No. MDL 2179, 2013 WL 144042 (E.D. La. Jan. 11, 2013) ....................................2

*In re UnitedHealth Group Inc. PSLRA Litig.*,
   643 F. Supp. 2d 1107 (D. Minn. 2009) .....................................................................3

*In re UnitedHealth Group Inc. S'holder Derivative Litig.*,
   631 F.3d 913 (8th Cir. 2011) ..................................................................................33

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*,
   No. 11-MD-2247 ADM/JJK, 2012 WL 3984542 (D. Minn. Sept. 11, 2012)......................2, 34

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
   396 F.3d 922 (8th Cir. 2005) .............................................................................18, 25

*John v. National Sec. Fire & Cas. Co.*,
   501 F.3d 443 (5th Cir. 2007)......................................................................................7

*Johnston v. Comerica Mortg. Corp.*,
   83 F.3d 241 (8th Cir. 1996) .....................................................................................32

*Klier v. Elf Atochem N. Am. Inc.*,
   658 F.3d 468 (5th Cir. 2011) ........................................................................ *passim*

*Ladegaard v. Hard Rock Concrete Cutters, Inc.*,
   No. 00 C 5755, 2004 WL 1459486 (N.D. Ill. June 28, 2004) ..................................7

*Masters v. Wilhelmina Model Agency*,
   473 F.3d 423 (2d Cir. 2007).....................................................................................32

*Powell v. Georgia Pacific Corp.*,
   119 F.3d 703 (8th Cir. 1997) .................................................................22, 23, 24, 25

010004-17 585821 V1

*Pryor v. Aerotek Scientific, LLC*,
  2011 WL 6376703 (C.D. Cal. Nov. 15, 2011)..........................................................5

*Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*,
  281 F.R.D. 327 (E.D. Wis. 2012),
  *aff'd*, 2013 U.S. App. LEXIS 501 (7th Cir. Jan. 9, 2013) .......................................5

*Shames v. Hertz Corp.*,
  No. 07-CV-2174-MMA(WMC), 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ....................32

*Shapira v. City of Minneapolis*,
  No. 06-CV-02190-MJD-SRN, 2012 WL 1438813
  (D. Minn. Apr. 26, 2012) ...........................................................................23, 28, 29

*Shaw v. Toshiba Am. Info. Sys.*,
  91 F. Supp. 2d 942 (E.D. Tex. 2000) ..........................................................................34

*Sykes v. Mel Harris & Assocs., LLC*,
  285 F.R.D. 279 (S.D.N.Y. 2012) ..................................................................................6

*Van Gemert v. Boeing Co.*,
  590 F.2d 433 (2d Cir. 1978), *aff'd*, 444 U.S. 472 (1980) ......................................32

*Van Sweden Jewelers, Inc. v. 101 VT, Inc.*,
  No. 1:10-cv-253, 2012 WL 4127824 (W.D. Mich. Sept. 19, 2012) .........................7

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005)............................................................................................7

*Will v. General Dynamics Corp.*,
  No. 06-698-GPM, 2010 WL 4818174 (S.D. Ill. Nov. 22, 2010).............................32

*Wilson v. Airborne, Inc.*,
  EDCV 07-770 VAP(OPX), 2008 WL 3854963 (C.D. Cal. Aug. 13, 2008)...........30

*Wolph v. Acer Am. Corp.*,
  No. C 09-01314 JSW, 2012 WL 993531 (N.D. Cal. March 23, 2012) ...............5, 6

*Young v. Nationwide Mut. Ins. Co.*,
  693 F.3d 532 (6th Cir. 2012) .......................................................................................5

*Zeisel v. Diamond Foods, Inc.*,
  No. C 10-01192 JSW, 2011 WL 2221113 (N.D. Cal. June 7, 2011)........................6

### OTHER AUTHORITIES

7 C.F.R. § 205.406(a)...................................................................................................20

2 MCLAUGHLIN ON CLASS ACTIONS § 8:15 (9th ed. 2013) .........................................24

3 NEWBERG ON CLASS ACTIONS § 14.03 (3d ed. 1992)....................................................................31

4 NEWBERG ON CLASS ACTIONS § 11:56 (4th ed. 2002) ................................................................34

*Black's Law Dictionary* (7th ed. 1999)...........................................................................................26

Barbara J. Rothstein & Thomas E. Willging, *Federal Judicial Center Managing Class
      Action Litigation:  A Pocket Guide for Judges* (3d ed. 2010)....................................................3

MANUAL FOR COMPLEX LITIGATION (FOURTH), § 21.66 (2004)....................................................30

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.222 (2004) ....................................................6

010004-17 585821 V1

## I.      INTRODUCTION

After years of hard-fought litigation (including a complete dismissal of this case, partial revival by the Eighth Circuit, and multiple arm's-length mediation sessions supervised by a U.S. Magistrate Judge and a professional mediator), the Parties to this action reached a negotiated, multi-million dollar settlement.  This Settlement provides monetary relief to the class members while providing equitable relief through a stipulated injunction.

However, even though the Settlement proposed here is fair, reasonable, and adequate under Rule 23 and Eighth Circuit case law, three sets of objections have been lodged, two filed by "professional" or "serial" objectors, presumably so that their counsel can collect a fee for holding up the class relief.  These objections are without merit and, accordingly, this Court should grant Plaintiffs' motions for final approval and for an award of reasonable attorneys' fees and costs, and class member service awards.

## II.      BACKGROUND

**A.      Despite Nationwide Notice Only Three Objections Were Submitted**

On September 14, 2012, the Court entered its Preliminary Approval Order, granting preliminary approval of the Settlement, conditionally certifying the Settlement Class, and directing notice to be disseminated.  Preliminary Approval Order, ¶¶ 1-2, 5, 8 (Dkt. # 321). Thereafter, notice issued.  *See generally* Decl. Tricia Solorzano (Dkt. # 331).  Even though extensive class notice issued in this case, which included approximately 2.4 million direct emails and 1.7 million postcards, *see generally* Decl. Dan Ross (Dkt. # 332), only three objections were filed.

First, on January 28, 2013, Jeffrey Weinstein and Burke Fort (the "Weinstein Objectors"), filed their objection.  *See* Dkt. # 334.  Later that day, Joseph Darrell Palmer filed an objection on behalf of Nancy Brown, John Hightower, Alison Paul and Cery Perle (the "Palmer

Objectors").  Dkt. # 337.[1]  Additionally, a third objection from Rajiv Dama was filed by ECF on

February 15, 2013, and dated November 5, 2013.  Dkt. # 342.  The submissions reflect a

misunderstanding of the facts of this Settlement and class action settlement law.

**B.      Mr. Weinstein and Mr. Palmer Are Professional Objectors, Raising Serious Concerns Regarding the Legitimacy of their Objections Here**

Neither Mr. Weinstein nor Mr. Palmer are strangers to objecting to class action

settlements; rather, both have been correctly characterized as professional objectors by the bar

and courts across the country.  Their objections are often dismissed, abandoned, or withdrawn

without change to the underlying settlement.  *See* Ex. 1 to Kurowski Declaration in Support of

Plaintiffs' Response to Objections ("Kurowski Decl.") (identifying Weinstein objections

dismissed, abandoned or withdrawn); *id.* at Ex. 2 (identifying Palmer objections dismissed,

abandoned or withdrawn).  And, many of the same courts have simultaneously chastised the

behavior of both Mr. Weinstein and Mr. Palmer.  *See*, *e.g.*, *In re Oil Spill*, No. MDL 2179, 2013

WL 144042, at *48 n.40 (E.D. La. Jan. 11, 2013) (noting "Mr. Palmer has been deemed a 'serial

objector' by several courts" and citing to a transcript in that case involving "Mr. Palmer

admitting it was 'regrettable' that he had been found to have engaged in 'bad faith and vexatious

conduct'"); *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, No. 11-MD-2247

ADM/JJK, 2012 WL 3984542, at *3 (D. Minn. Sept. 11, 2012) (noting "the Palmer Objectors

appear to be represented by an attorney who has not entered an appearance in this case and who

is believed to be a serial objector to other class-action settlements … This attorney, Darrell

Palmer, paid the appellate filing fee on behalf of the Palmer Objectors, and the documents filed

on their behalf bear his California mailing address rather than the Texas addresses of the Palmer

---

[1] Mr. Palmer also entered an appearance on behalf of Sandra Yuen; however, Ms. Yuen is not identified as an objector in Mr. Palmer's written objections filed with the Court.  *Compare* Dkt. # 335 (entering appearance on behalf of Ms. Yuen) *with* Dkt. # 337 (written objections).

Objectors."); *In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. 2d 289, 295 (S.D.N.Y. 2010) (concurring "with the numerous courts that have recognized that professional objectors undermine the administration of justice by disrupting settlement in the hopes of extorting a greater share of the settlement for themselves and their clients," and finding "sufficient evidence to conclude that the … Weinstein Objectors … are represented by serial objectors and … have engaged in bad faith and vexatious conduct").  *See also infra* at III.D.2.

As noted by a court in this Circuit, while appropriately recognizing that legitimate "[o]bjectors may add value," the court characterized the professional objectors before it with abundantly colorful but accurate language.  *In re UnitedHealth Group Inc. PSLRA Litig.*, 643 F. Supp. 2d 1107, 1109 (D. Minn. 2009) (quoting *In re Cardinal Health, Inc. Sec. Litig.*, 550 F. Supp. 2d 751, 753 (S.D. Ohio 2008)).  The court stated that the professional objectors "contributed nothing," filed pleadings "charitably … described as disingenuous," offered "laughable" suggestions, all with the goal to "hijack as many dollars for themselves as they can wrest from a negotiated settlement."  *Id.*  Even the Federal Judicial Center cautions the judiciary regarding professional objectors, directing jurists to "[w]atch out … for canned objections from professional objectors who seek out class actions to extract a fee by lodging generic, unhelpful protests."  Barbara J. Rothstein & Thomas E. Willging, *Federal Judicial Center, Managing Class Action Litigation:  A Pocket Guide for Judges* at p. 17 (3d ed. 2010).  *See also In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1361 n.30 (S.D. Fla. 2011) ("[P]rofessional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors.  Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised, gains nothing.") (quotations omitted, alteration in original).  The Weinstein and Palmer

010004-17 585821 V1

Objections here fall into the same category and their complaints should be afforded little weight. *See also infra* at III.D.2 (discussing Mr. Palmer's lack of fitness to appear in this case).

## III.    ARGUMENT

The scope of the objections before this Court are narrow and reflect three basic challenges.  First, the Objectors challenge only certain issues related to the Court's certification of a class for settlement purposes under Rule 23(a) and (b)(3).  Second, the Objectors challenge the fairness, reasonableness, and adequacy of the Settlement, particularly as it relates to the *cy pres* provision.  Lastly, the Objectors challenge Plaintiffs' request to be compensated for some, but not all, of the extensive efforts they have performed for the class members.  As explained below, each challenge fails.  Furthermore, additional procedural issues call for the denial of the Palmer Objection, as well as the barring of Mr. Palmer's appearance in this case.

## A.    The Objections to Class Certification Fail

### 1.    The class definition is adequate and understandable.

The Weinstein Objectors assert that the settlement class definition "does not adequately define the class."  Dkt. # 334 at 1.  The definition is:

> All persons in the United States and/or the District of Columbia
> who purchased, for personal use and not for resale, organic milk,
> organic butter, organic cream and organic non-fat dry milk
> produced, processed, marketed and/or sold by Aurora Organic
> Dairy and its affiliates ("Milk Products"), including but not limited
> to the Milk Products sold under aurora Organic Dairy's 'High
> Meadow' brand, Costco's 'Kirkland' brand, Safeway's 'Safeway
> Select' and 'O Organics' brands, Target's 'Archer Farms' brand,
> Wal-Mart's 'Great Value' brand, and Wild Oats' 'Wild Oats'
> brand, on or before [the Preliminary Approval Date]
> [September 14, 2012].

Settlement Agreement at 18; Preliminary Approval Order at 2; Notice Of Proposed Class Action Settlement.  The Weinstein Objectors do not argue that the class definition is overbroad, unascertainable, or any other deficiency preclusive to certification.  Rather, they complain that a

person reviewing the class settlement materials *might* be confused as to whether he or she is a member of the class.  This objection is meritless for multiple reasons.

"Although there is no explicit requirement concerning the class definition in FRCP 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed."  *Wolph v. Acer Am. Corp.*, No. C 09-01314 JSW, 2012 WL 993531, at *1 (N.D. Cal. March 23, 2012) (citation omitted).  To be "precise, objective and presently ascertainable," the class definition "must be sufficiently definite so that it is administratively feasible to determine whether a particular person is a class member."  *Id*. (citation omitted); *Pryor v. Aerotek Scientific, LLC*, 2011 WL 6376703, at *5 (C.D. Cal. Nov. 15, 2011).  To satisfy this implicit requirement, "the plaintiff need only propose a class that is 'precise enough to enable the court to determine whether at any given time a particular individual is or is not a member of the class.'"  *Reliable Money Order, Inc. v. McKnight Sales Co., Inc*., 281 F.R.D. 327, 331 (E.D. Wis. 2012) (citing *Bzdawka v. Milwaukee Cnty.*, 238 F.R.D. 469, 474 (E.D. Wis. 2006)), *aff'd*, 2013 U.S. App. LEXIS 501 (7th Cir. Jan. 9, 2013).  "The standard for ascertainability 'is not demanding.'"  *Flores v. Anjost Corp.*, 284 F.R.D. 112, 122 (S.D.N.Y. 2012) (quoting *Gortat v. Capala Bros., Inc.*, No. 07-CV-3629 (ILG), 2010 WL 1423018, at *2 (E.D.N.Y. Apr. 9, 2010)).  "It is designed only to prevent the certification of a class whose membership is truly indeterminable."  *Id*.  "An identifiable class exists if its members can be ascertained by reference to objective criteria."  *Id*. (quoting *Stinson v. City of N.Y.*, 282 F.R.D. 360, 373 (S.D.N.Y. 2012)); *accord Reliable Money Order*, 281 F.R.D. at 331 ("a class is sufficiently definite if its members can be ascertained by reference to objective criteria"); *Young v. Nationwide Mut. Ins. Co*., 693 F.3d 532, 538 (6th Cir. 2012) ("For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or

excluded from the class by reference to objective criteria."); *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 287 (S.D.N.Y. 2012) (class members should be ascertained "by reference to objective criteria").

Here, persons entitled to relief under the Settlement are those who purchased the Milk Products at issue, specifically organic milk, organic butter, organic cream, and organic non-fat dry milk. *See*, *e.g*., Settlement Agreement at 17, 18. The purchase of goods or services is a classically objective criteria. Indeed, the MANUAL FOR COMPLEX LITIGATION, cited by the Weinstein Objectors (Dkt. # 334 at 2), provides the following as an example of a precise, objective and presently ascertainable definition: "those persons … that purchased specified products … from the defendants during a specified period." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.222 (2004). *See also*, *e.g.*, *Wolph*, 2012 WL 993531, at *2 (finding it administratively feasible to determine whether a particular individual was member of a class who "purchased the notebook at issue and did not return it"); *Zeisel v. Diamond Foods, Inc*., No. C 10-01192 JSW, 2011 WL 2221113, at *6 (N.D. Cal. June 7, 2011) (proposed class defined of persons "who purchased" Shelled Walnut Products in certain ounce sizes having a described label found objective and precise) (citing, *e.g.*, *Chavez v. Blue Sky Natural Bev. Co.*, 268 F.R.D. 365, 377 (N.D. Cal. 2010) (concluding that class of persons who purchased beverage bearing disputed mark or brand, in the United States, during a particular period was ascertainable)).

The Weinstein Objectors do not assert that the class definition lacks objective criteria, administrative feasibility, or ascertainability, but rather, suggest that it is imprecise due to the word "and" in the phrase "organic milk, organic butter, organic cream and organic non-fat dry milk." According to the Weinstein Objectors, this "appears to limit the class to only those persons who purchased ***all four*** product types" or "could reasonably [be read in that manner]."

Dkt. # 334 at 3 (emphasis in original).[2]  *See also id.* at 5.  Fundamentally, the objection is founded upon a subjective and hypothetical possibility that someone ***might or could*** read the word "and" to imply that he must have purchased all four product types to be a class member.

As an initial matter, the Weinstein Objectors offer no evidence of any kind that any class member actually suffers from any such confusion.  Speculation is not a basis for denying class certification.  *See*, *e.g.*, *Van Sweden Jewelers, Inc. v. 101 VT, Inc.*, No. 1:10-cv-253, 2012 WL 4127824, at *4 (W.D. Mich. Sept. 19, 2012) ("speculation should [not] defeat class certification"; finding proposed class sufficiently definite); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (rejecting objection that Spanish-speaking people who could not read and understand the English-only Settlement Documents where objector failed to present sufficient evidence that there was, in fact, "an identifiable subclass of claimants who could not comprehend the Settlement Documents …").  Even if the Weinstein Objectors produced such evidence, "[t]he question is not whether a particular recipient understood the contents of the notice, but whether the notice reasonably conveyed the necessary information to the average class member."  *F.C.V., Inc. v. Sterling Nat'l Bank*, 652 F. Supp. 2d 928, 943 (N.D. Ill. 2009) (citation omitted); *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 C 5755, 2004 WL 1459486, at *2 (N.D. Ill. June 28, 2004) ("In general, the court will assume that the

---

[2] The cases cited by the Weinstein Objectors are inapposite.  In *John v. National Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 n.3 (5th Cir. 2007), the plaintiffs did not even "*contend* that the class they propose[d] [was] ascertainable."  *Id*. at 445 (emphasis added).  The class definition proposed in *DeBremaecker v. Short*, 433 F.2d 733 (5th Cir. 1970) was  all "residents of this State active in the 'peace movement' who have been harassed and intimidated as well as those who fear harassment and intimidation in exercising their First Amendment right of free expression …."  This definition was overbroad as including persons uninjured by the alleged misconduct. *Id*. at 734.  It also was defective because the phrase "peace movement" included a "broad spectrum of positions and activities which could conceivably be lumped under that term."  *Id*. Here, the Milk Products at issue are expressly identified and there is no subjectivity; class members either purchased Milk Products or did not.

class members are literate and able to understand a notice such as the opt-out notice.")).  There is no question here that it does.

A person reading the class definition does not do so in a vacuum, but in the context of the notices and other information provided.  *See*, *e.g*., *F.C.V., Inc.*, 652 F. Supp. 2d at 943 (faulty understanding of class settlement stemmed from class member's failure to have requested a copy of the settlement agreement as the notice stated he could do, or call the number in the notice to ascertain further details).  It is abundantly clear from the class definition itself, along with the material included with the notice to putative class members, that a person need not have purchased all four product types to be in the class.  The class definition states that a person who purchased "Milk Products" for personal use and not resale is a member of the class.  "Milk Products" is described as organic milk, butter, cream and non-fat dry milk.  The word "and" is appropriately used to indicate that all four product types are included in the phrase "Milk Product."  The Official Notice (as well as the Settlement Agreement) explains that a class member may be entitled to the Category A award of $10.00 without proof of purchase by verifying on the claim form that he or she "purchased ***one or more Units*** of Milk Products." Official Notice (Dkt. # 331-3 at ¶ 6) (emphasis added); *see also* Settlement Agreement at 20 (Category A Claim is for class members filing a timely sworn claim form that he or she purchased "one or more Units of Milk Products").  This clearly informs the reader that he or she need only have purchased ***one Unit*** of the Milk Products (*e.g*., one half-gallon of milk) to be entitled to the $10.00 Category A relief.  That being so, no average reader could understand that class membership depends on purchasing all four product types.[3]

---

[3] The Category B relief with proof of purchase is ***additional*** to the base-line Category A relief, and reinforces that the starting point for relief is one Unit of Milk Products, which may go up from there for a maximum of $30, "depending upon the number of Units of Milk Products purchased."  *Id.*  *See also* Settlement Agreement at 20 (describing Category B Claims).

The Published Notice also describes the Milk Products (organic milk, organic butter, organic cream, and organic non-fat dry milk) and states:

> **ARE YOU AFFECTED?**
> If you purchased ***any of the Milk Products*** in the U.S. for personal, family or household uses on or before September 14, 2012, then you are a member of the Settlement Class.  Be sure to visit the Settlement Website for complete class member information.

Published Notice (Dkt. # 331-1) (emphasis added).  Here again, it is clear that a person who purchased ***"any"*** (not all) of the described Milk Products is a member of the class.

In both notices, readers also are directed to the *In Re: Aurora Dairy Corp. Organic Milk Marketing & Sales Practices Litigation Settlement Website* for more information.  That website provides putative class members with the Second Amended Master Complaint, the full Settlement Agreement, Preliminary Approval Order, Motion and Memorandum in Support of Motion for Preliminary Approval, answers to frequently asked questions, and the Claim Form.

The answers to frequently asked questions reiterate what is stated in the notices and Settlement – that persons entitled to an award (of $10 or more) is a person who verifies (and, if he/she desires, also provides proof of purchase) that he or she "purchased **one or more** Units of Milk Products."  *See* Answers To Frequently Asked Questions, Question No. 7 (Kurowski Decl., Ex. 3) (emphasis added).   In addition, the Claim Form states, among other things:

> Aurora Organic Dairy produced Milk Products (including organic milk, organic butter, organic cream, and organic non-fat dry milk) including Milk Products sold under Aurora Organic Dairy's "High Meadow" brand, Costco's "Kirkland" brand, Safeway's "Safeway Select" and "O Organics" brands, Target's "Archer Farms" brand, Wal-Mart's "Great Value" brand, and Wild Oats' "Wild Oats" brand.  If you purchased ***any of the Milk Products*** produced by Aurora Organic Dairy, including the products identified below, on or before September 14, 2012 in the United States for personal use and not for resale, you may be able to recover money.

Claim Form (Dkt. # 331-4 at 1).  The Claim Form explains that in order to be entitled to the $10.00 award, the class member must complete the form and sign the Verification at the end of

- 9 -

the form.  That Verification requests the class member to declare that he or she "purchased one or more Units of Milk Products at issue in this lawsuit …." *Id*. (Verification).  The Claim Form also advises that to be eligible to receive up to $30, the class member must complete the form, sign the Verification, and also submit acceptable documents showing "your purchase of ***one or more of the products listed above*.**" *Id*.  The Claim Form reiterates later that "[t]o recover the maximum amount you can from the Settlement Fund, attach documents showing your purchase of ***one or more of the products listed above*.** *Id.*  It is crystal clear that to be in the class, a person need not have purchased all four of the product types.

The Weinstein Objectors stretch even further in their attempt to create ambiguity through the slight variations in language in the definition of "Settlement Class" in Paragraph II.QQ and the definition to which the parties stipulated (and this Court preliminarily approved) in Section III.A of the Settlement Agreement.  *See* Weinstein Obj. at 4.  For example, the Weinstein Objectors contend that because the Paragraph II.QQ definition contains the phrase "consumers and/or purchasers," while the Section III.A contains only the word "purchased," there is an ambiguity that makes the class inadequately defined and the notice confusing.  *Id.*  This assertion is as meritless as the first objection.

First, the Settlement Agreement expressly provides that a "Settlement Class Member" is a person who "falls within the definition of the Settlement Class set forth [not in Paragraph II.QQ but] in Paragraph III.A," which is the paragraph containing the class definition to which the parties stipulated and this Court preliminarily approved.  The definition in Paragraph III.A does not use the word "consumer" and that word's presence in Paragraph II.QQ is a non-issue.

Second, the Settlement Agreement, Preliminary Approval Order, Notices, Claim Form, and other information available to putative class members (including the Second Amended Class

Action Complaint) all make clear that a person must have purchased at least one Milk Product to be in the class.  The *Aurora Dairy Sales Practices Litigation* Website states at the top of the homepage:  "If *you purchased* Milk Products … produced by Aurora Organic Dairy and sold in the U.S. under certain brands, … on or before September 14, 2012, you may be entitled to compensation …."  *See generally* http://www.OrganicMilkMarketingSettlement.com (last visited Feb. 19, 2013).  The Official Notice states:  "If *you purchased* Milk Products … produced by Aurora Organic Dairy and sold in the U.S. under certain brands … you may be entitled to compensation."  Dkt. # 331-3 (emphasis added).  It also states:  "This Notice is to inform you of the settlement of a class action lawsuit entitled *In Re: Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices Litig.*, Case No. 4:08-md-01907-ERW (ALL CASES) (the "Litigation"), ***brought on behalf of retail purchasers*** of Milk Products produced by Aurora Organic Dairy … the Named Plaintiffs in the Litigation brought multiple class action lawsuits on behalf of themselves and others ***who purchased*** Milk Products produced by Aurora Organic Dairy."  *Id.* (emphasis added).  The Published Notice similarly states:  "If *you purchased* Milk Products … produced by Aurora Organic Dairy … you may be entitled to compensation …."  Dkt. # 331-1 (emphasis added).  The Notice also answers the question "Are You Affected?" by stating:  "If you ***purchased*** any of the Milk Products in the U.S. for personal, family or household uses on or before September 14, 2012, then you are a member of the Settlement Class."  Dkt. # 331-3 (emphasis added).  The Second Amended Master Complaint (made available through the website) is replete with statements clearly indicating that the lawsuit, plaintiffs, class members, and injury stem from the purchase of allegedly misrepresented Milk Products.[4]  The Settlement

---

[4] *See* Second Amended Class Action Complaint, ¶ 60 ("The premium Defendants gained from the sale of their Milk Products is significant, totaling millions of dollars per year.  Plaintiffs would not have purchased Defendants' Milk Products had they known the truth."); ¶ 62 ("Aurora sold Milk Products to other retailers, who then sold these products under their own private-label

Agreement and Claim Form also make clear that persons entitled to an award are those verifying that they purchased at least one of the Milk Products at issue. There is no ambiguity.

The Weinstein Objectors also suggest that there is some sort of ambiguity because Paragraph II.QQ does not, like Paragraph III.A, say that the purchase must have been for personal use and not for resale. Weinstein Obj. at 3. The definition in Paragraph III.A is the operative one and provides that persons in the class are those who purchased "for personal use and not for resale." The other documents available to putative class members also clearly apprise that a purchaser for resale is not included in the class.[5]

Finally, the Weinstein Objectors take issue with reference to the District of Columbia in the class definition, urging (with mighty semantic gyration) that the average reader would not know whether persons in Puerto Rico are in the class since "on the one hand, they are certainly 'in the United States'" but on the other hand, Puerto Rico is not a state within the United States. Weinstein Obj. at 4-5. Again, there is no ambiguity. As the Weinstein Objectors correctly

---

brands to consumers."); ¶ 72 ("The conduct described above caused injury to Plaintiffs and the other members of the Classes who purchased 'High Meadow' Milk Products. Plaintiffs would not have purchased 'High Meadow' Milk Products had they known the truth."); ¶ 83 (same regarding "Kirkland Signature" Milk Products); ¶ 92 (same regarding "O Organics" Milk Products); ¶ 101 (same regarding "Archer Farms" Milk Products); ¶ 101 (same regarding "Great Value" Milk Products); ¶124 (same regarding  "Wild Oats Organic" Milk Products); ¶ 125 ("Based on Defendants' representations, warranties, deceptive statements and material omissions … Plaintiffs and the putative Classes were willing to pay – and did pay – premium prices for the Milk Products"); ¶ 127 ("Plaintiffs would not have purchased Defendants' Milk Products had they known the truth"); ¶¶ 128-129 (defining class members as those who purchased the Milk Products at issue for personal, household, or family use and consumption and not for resale).

[5] *See*, *e.g.*, Official Notice ("4. Who Is Included In The Settlement?  The class covered by the Settlement (the "Settlement Class") is defined as follows:  all persons in the United States and/or the District of Columbia who purchased, for personal use and not for resale, organic milk, organic butter, organic cream and organic non-fat dry milk produced, processed, marketed and/or sold by Aurora Organic Dairy and its affiliates ("Milk Products")); Published Notice ("If you purchased any of the Milk Products in the U.S. for personal, family or household uses on or before **September 14, 2012**, then you are a member of the Settlement Class"); Second Amended Class Action Complaint, ¶ 129 ("In defining these Classes, the persons purchasing the Milk Products include those who purchased for personal, household, or family use and consumption, but not for commercial resale"); Claim Form ("If you purchased any of the Milk Products produced by Aurora Organic Dairy, including the products identified below … for personal use and not for resale, you may be able to recover money.").

observe, the District of Columbia is not a state, but is "in" the United States.  So, people living in the District of Columbia are part of the class.  Puerto Rico is neither a state nor a part of the United States.  *See*, *e.g.*, *Downes v. Bidwell*, 182 U.S. 244, 287 (1901) ("the Island of Puerto Rico is a territory appurtenant and belonging to the United States, but not a part of the United States").  Hence, Puerto Rico is not "in" the United States as the Weinstein Objectors suggest and there is no basis for their claim of ambiguity.

### 2.   The Notice is adequate.

The Palmer Objectors' assertion that the Notice "does not provide class members with accurate information regarding the cash compensation that will be received by them" is a curious one.  Palmer Obj. at 12-13.  The Palmer Objectors complain that because cash awards will be reduced on a pro rata basis if Category A and Category B claims exceed the amount of funds available in the Settlement Account following satisfaction of Settlement Costs, it is "possible that class members will not receive the promised one-time payment of $10."  *Id*. at 13.  While the Palmer Objectors might be dissatisfied with that possibility, they cannot claim inadequacy of the notice since they rely on the notice for their understanding of the potential *pro rata* reduction.  The Palmer Objectors clearly understood the Notice; they can hardly contend that others do not.

The Palmer Objectors also contend that the Notice is inadequate because it "does not provide any information regarding the identity of the organizations to which cy pres distributions are to be made."  Palmer Obj. at 13.  The Palmer Objectors assert that class members "are entitled to know which organizations will benefit from the funds that are intended to benefit the class"[6] and the notice is inadequate without that information.  *Id*. at 13-14.  They cite nothing

---

[6] A *cy pres* distribution will occur only if the Available Cash Award exceeds the Calculated Cash Award Total and there are excess funds after payment of Settlement Costs and awards to class members.  *See* Settlement Agreement at 23 (§ V.B), 27 (§ VIII).  It is thus incorrect for the

whatsoever for this proposition.  In any event, the Palmer Objectors' assertion that the class does not know the potential *cy pres* recipients fails given that the recipients are plainly disclosed.[7]

      The Official Notice and the Published Notice both expressly direct readers to the Settlement Website and advise that other information is contained therein, including the Settlement Agreement.  *See* Official Notice ("This Notice and the Settlement Agreement in its entirety are posted on the Settlement Website, www.OrganicMilkMarketingSettlement.com, and are also available from the Claims Administrator … Class Litigation Settlement Agreement and Release ("Settlement Agreement") available on the Settlement Website at www.OrganicMilkMarketingSettlement.com"); Published Notice ("For more details [about the settlement agreement,] write to the address or visit the website identified below …  Be sure to visit the Settlement Website for complete class member information.").  The potential *cy pres* recipients are identified by name in Section VIII.B of the Settlement Agreement (Organic Farming Research Foundation and Consumers Union).  This information is as easily available to the Palmer Objectors as it is to all other persons who received notice and chose to access the website, or call the Administrator for further information.  Choosing not to read available information does not make a notice inadequate.

---

Palmer Objectors to suggest that the *cy pres* recipients would take money belonging to any class member who properly files a claim.

[7] Consumers Union "is an expert, independent, nonprofit organization whose mission is to work for a fair, just, and safe marketplace for all consumers."  CU Website, Homepage (http://www.consumersunion.org/about).  Among other things, Consumers Union specifically addresses the subject of organic foods, stating its mission to "preserve the integrity of the organic label and opposes any efforts to weaken organic standards."  *Id.* (http://www.consumersunion.org/pub/f/foodorganic/index.html).  The mission of the Organic Farming Research Foundation is to facilitate and encourage the improvement and adoption of organic farming practices.  *See* OFRF Website Homepage (http://ofrf.org/).  Both organizations and their missions are closely related to the subject of the lawsuit.  Both are national in scope and both are established organizations able to carry out their objectives.

3.     **The class representatives are adequate, meeting Rule 23(a)(4)'s requirements.**

The Weinstein Objectors offer two "adequacy" arguments.  First, they contend that the class representatives are inadequate because they are not class members.  Second, they contend that the class representatives are inadequate because of the *cy pres* provision.  Each quarrel fails.

a.     **Plaintiffs are members of the class preliminarily certified and the Weinstein Objectors' argument misconstrues the Rule 23(a)(4) inquiry.**

As a foundational matter, the Weinstein Objectors contend that the class representatives are not adequate because "the class definition … likely requires the purchase of all four product types," where "[t]here is no evidence that any of the class representatives purchased all four product types."  Weinstein Obj. at 6.  As explained above, the Weinstein Objectors' reading of the class is incorrect.  *See supra* at III.A.1.  Regardless, as demonstrated in their opening Motion for Final Approval, Plaintiffs are adequate under Fed. R. Civ. P. 23(a)(4).  The Weinstein Objectors' statement misconstrues Rule 23's adequacy requirement.

The text of Rule 23 requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  As ignored in their objections, "[t]he focus of Rule 23(a)(4) is whether:  (1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel."  *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 905 (N.D. Iowa 2008) (citing *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 562-63 (8th Cir. 1982)).  "The Supreme Court has advised that the adequacy inquiry 'serves to uncover conflicts of interest between named parties and the class they seek to represent.'"  *Id*. (citing *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 625 (1997)).  Thus, in reviewing objections regarding the adequacy of a class representative, the Eighth Circuit looks for any "indication that

- 15 -

[the class representative's] interest was antagonistic to the remainder of the class or that the claims were not vigorously pursued." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1175 (8th Cir. 1995) (citing *Paxton*, 688 F.2d at 562-63) (finding no abuse of discretion by the district court in finding Rule 23(a)'s prerequisites were satisfied). The Eighth Circuit added that "[t]he adequacy of class representation … is ultimately determined by the settlement itself." *Id*. at 1175 (internal citations and quotations omitted).

Plaintiffs satisfy these requirements, which the Weinstein Objectors do not and cannot dispute. First, there can be no argument that any of the class representatives have any interests that are antagonistic to the remainder of the class, particularly where each class representative purchased the same products as the members of the class. Nor can there be any argument that the claims here were not vigorously pursued in this lawsuit. And, as the docket readily reflects, the class representatives have vigorously pursued this suit since inception, both before this Court and before the Eighth Circuit. And, there is no challenge that Class Counsel are not adequate.

> **b.      The presence of a *cy pres* provision does not mean class representatives are inadequate, particularly where *cy pres* payments occur, if at all, only after payment to class members.**

The Weinstein Objectors declare that "[b]y agreeing to transfer money that is owed to class members to a third party, the class representatives and class counsel were inadequate representatives of the class." Weinstein Obj. at 6. This argument is wholly unsupported by citation to salient authority, and nonsensical. Indeed, if the Weinstein Objectors' argument were correct, no *cy pres* provision would ever be approvable in a class action, which even Weinstein's own case law contradicts. *See*, *e.g.*, *Klier v. Elf Atochem N. Am. Inc.*, 658 F.3d 468, 473 (5th Cir. 2011) ("Federal district courts often dispose of … unclaimed funds by making … *cy pres* distributions"). Weinstein's assertion is further undercut by the *cy pres* provisions in the

Settlement Agreement and the extensive efforts to notify class members of their right to make a claim.

Any *cy pres* payments are a last resort measure.  The Settlement provides that money will be distributed *cy pres* only after all class benefits have been paid, *i.e.*, "[i]f amounts remain in the Settlement Account following the payment of all Settlement costs, including Cash Awards, Monitoring Costs, Notice and Administration Costs, Attorneys' Fees and Expenses, Service Awards, and Taxes."  Settlement Agreement, § VIII.A.  To the extent a *cy pres* distribution is made, it will be because there is money left over unclaimed by class members.  There is nothing remotely improper about creating a mechanism to address that situation.  Moreover, the Weinstein Objectors' adequacy argument ignores the extensive efforts that have been made in order to provide settlement class members the opportunity to submit claims in the case.  This Settlement provided notice nationwide in major, widely-read publications, extensive internet advertising, a press release, and direct notice to Costco members (with Costco sending approximately 2.7 million e-mails and 2.0 million postcards).  Mot. Mem. Final Approval at 11-12 (Dkt. # 328).  And, these efforts were combined with a simple claims process, permitting class members to submit claims online by entering basic information.[8]  Thus, this "adequacy" argument also fails.

### 4.      The settling parties have met their burden of proof.

The Weinstein Objectors also claim, without analysis or even citation to any specific facts before the Court, that "[t]he settling parties have not met their burden of proof," *i.e.*, "that all Rule 23(a) requirements have been met, as well as one of the subdivisions of Rule 23(b)."  Weinstein Obj. at 6 (citing *Amchem,* 521 U.S. at 614).  This is simply another throwaway

---

[8] *See generally* File A Claim http://www.organicmilkmarketingsettlement.com/ FileClaim/UnknownClaim (last visited February 8, 2013).

argument as the ***only*** challenge mounted by the Weinstein Objectors regarding Rules 23(a) or (b) involves a misguided adequacy argument under Rule 23(a)(4).  They mount no dispute as to any other Rule 23(a) or (b) inquiry.  For the reasons described above, this adequacy argument is meritless.  *See supra* at III.A.3.  Accordingly, the Court should reject the argument that the settling parties have not carried their burden of proof.

**B.      The Objections to the Fairness of the Settlement Likewise Fail**

**1.      An objection that Plaintiffs might receive a better result at trial misconstrues the inquiry courts make at final approval.**

First, the Palmer Objectors make numerous suggestions that it is not clear "that a better result cannot be achieved at trial."  Palmer Obj. at 4.  This argument can be quickly disposed as it misconstrues the analysis before the Court.[9]  Whether Plaintiffs might have achieved a better result at trial is not the question before the Court, rather it is whether "the merits of plaintiff's case, weighed against the terms of the settlement" confirm the fairness of the settlement.[10]  *See generally In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005) (outlining the four factors courts in the Eighth Circuit must consider in determining whether a settlement is fair, reasonable, and adequate).  *Cf. In re Checking Account Overdraft Litig.*, 830 F.

---

[9] Moreover, the Palmer Objectors cite another court's test for determining whether a settlement is fair, reasonable, and adequate.  *See* Palmer Obj. at 3 (citing *True v. American Honda Motor Co.*, 749 F. Supp. 2d 1052, 1063 (C.D. Cal. 2010)).  Yet, even the *True* case does not suggest that the Court looked to whether a better result at trial could have been achieved, noting that in evaluating a proposed settlement "[t]he question is not whether the settlement could be prettier, smarter, or snazzier," as the Palmer Objectors effectively suggest, "but solely whether it is fair, adequate, and free from collusion."  *Id.* (quotation omitted).

[10] As Plaintiffs explained in their Motion for Final Approval, the merits of Plaintiffs' case, weighed against the terms of settlement, favors settlement.  Dkt. # 328 at 15-18.  Here, while Plaintiffs remained confident in the merits of their case and the strength of their case when applied to the law, others disagreed, including this Court (which completely dismissed Plaintiffs' Complaint) and the Eighth Circuit (which revived Plaintiffs' case, but affirmed the dismissal of the stronger of Plaintiffs' misrepresentation claims, *i.e.*, "class plaintiffs' claims based upon Aurora's and the retailers' marketing, representing and selling milk as organic when, allegedly, it was not").  *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices Litig.*, 621 F.3d 781, 797 (8th Cir. 2010).

Supp. 2d at 1345 ("The Court is not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial.") (quotation omitted).

Even if the potential of a "better trial result" were the appropriate inquiry in this Circuit, the facts of this case refute the Palmer Objectors' argument as to whether a better trial result would have been achievable.  Here, continuing litigation risks included the risk of going to trial and recovering nothing, recovering less than the amount provided by the Settlement, or winning only to be reversed on appeal.[11]  Here, the Settlement provides that class members may receive as much as 1000% of their damages (even without any proof of purchase).  Moreover, Plaintiffs also achieved injunctive relief for the class members, which the Palmer Objectors do not suggest would be better if the parties proceeded to trial.  Instead, the Settlement ensures that such concerns are appropriately addressed, and provides a set time period to ensure that the farming practices remain implemented at Aurora's Platteville production facility, all to address Plaintiffs' claim that Milk Products were allegedly advertised as having qualities that they did not actually possess.  As a result, the Palmer Objectors' speculation that a better trial result would be achievable must fail.

### 2.      The injunctive relief is far from illusory.

The Weinstein Objectors assert that the injunctive relief afforded by the Settlement is "illusory" for two reasons – first, because it "merely requires practices that Defendant is already doing," and second, because the "the time period is based on the date of Preliminary Approval, not the Effective Date."  Weinstein Obj. at 7-8.  Both contentions are far off base.

---

[11] Even if litigation classes were certified and a hypothetical 'better result' were achieved at trial in several years, Plaintiffs could still lose on appeal, a fact furthering settlement. *See Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 445 (S.D. Iowa 2001) ("[T]here appears to be a strong case on the merits.  But as the parties point out, trying this case is fraught with danger.  They could lose on the merits … Even if successful at trial, they could lose on appeal.").

A fundamental allegation contends that during the relevant time period, the Milk Products were not actually produced according to the practices represented by Aurora and the Retailer Defendants on the product packaging.  *See* Second Amended Master Complaint, ¶ 47. Plaintiffs also aver the USDA alleged that Aurora had failed to comply in various respects with federal law regarding production of the Milk Products labeled as organic.  *Id*. at ¶¶ 47-52.  In August 2007, Aurora and the USDA entered into a consent agreement under which Aurora agreed to amend its organic system plan ("OSP") for the Platteville facility in accordance with federal requirements.  The Consent Agreement specified the practices that Aurora was to implement.  *See* Consent Agreement at 1-2 (Kurowski Decl., Ex. 4).  Under the Consent Agreement, Aurora had a one-year inspection period after which the responsible party was to verify that these practices had been implemented and that Aurora had operated in compliance therewith since October 15, 2007.  *See* Consent Agreement at 3.  The Consent Agreement, however, does not specify how long Aurora must retain the OSP as amended to include the operational corrections found proper by the USDA.  Moreover, while producers wishing to sell products as organic must have an OSP in place, there is no prohibition against amending it.  An operation may simply submit an updated OSP which includes "a summary statement … detailing any deviations from, changes to, modifications to, or other amendments made to the previous year's organic system plan during the previous year" and "[a]ny additions or deletions to the previous year's organic system plan intended to be undertaken in the coming year."  7 C.F.R. § 205.406(a).

In sum, neither the 2007 USDA Consent Agreement nor the regulations require that Aurora continue to adhere to the practices set out in the Consent Agreement.  The Settlement Agreement does require such adherence.  *See* Settlement Agreement, § VI.A (1-8); *compare*

Consent Agreement at 1-2.  The Weinstein Objectors have no quarrel with the value of the practices themselves; they simply ignore the added value in binding Aurora to those practices. Aurora not only has agreed to abide by these practices for a period of three years, but has also agreed to submit a fact-based annual report to a Court-appointed Monitor in order to demonstrate its compliance.[12]  The Monitor will review these reports for compliance, identify any areas of concern, and Aurora will have thirty days to address and/or correct those concerns.  If not resolved, the Monitor will report to Class Counsel who may seek Court intervention.  Any costs associated with implementing the injunctive relief that do not relate to the Monitor will be paid by Aurora separate from the Settlement Amount.  *See* Settlement Agreement, §§ VII.A-F.  The Settlement Agreement not only binds Aurora to practices found appropriate by the USDA for a period of three more years, but provides an enforcement mechanism.  It is far from illusory.

The Weinstein Objectors also suggest that the injunctive relief is illusory because the three-year period begins on the date of Preliminary Approval (September 14, 2012) rather than the Effective Date of the Settlement Agreement.  Weinstein Obj. at 7-8.  Thus, they say, the term is not really three years because the Effective Date is when the approval order becomes final and avenues of appellate review have expired.  *Id.*  This theory is contrary to the intent of the Settlement Agreement, which is that Aurora will continue to perform the identified practices, and submit annual reports, for a period of three years beginning on the date of Preliminary Approval. Neither Plaintiffs nor Aurora interpret the injunctive provisions as inoperable until the Effective Date.  The Weinstein Objectors are simply mistaken.

---

[12] The Parties have agreed to the appointment by the Court of Ms. Katie Lindquist, an independent organic inspector and a member of the International Organic Inspectors Association.

3.      **The Objectors' attack on the *cy pres* provision fails.**

Both objector groups attack various aspects associated with the Settlement's *cy pres* provision.  These objections should be rejected.  The *cy pres* provision, like the rest of the Settlement, is consistent with the law of this Circuit and is fair, reasonable, and adequate.  Under the terms of the Settlement, a *cy pres* distribution occurs only after class members have submitted claims and been paid.  It does not limit class members' recovery, but rather ensures that settlement funds do not revert back to Defendants.

a.      **The Objectors' argument that direct payments to class members should be made pro rata fails for numerous reasons.**

First, the Weinstein Objectors contend that "a *cy pres* payment is not appropriate in this case because payments can be made directly to the class members," suggesting that "any excess monies could be paid to the class members who make claims."  Weinstein Obj. at 8.  *See also id.* at 9 ("In this case it is still logistically feasible and economically viable to make additional pro rata distributions to class members and class members do not have liquidated-damages claims that were 100 percent satisfied by the initial distribution.") (quotations omitted).  Similarly, the Palmer Objectors suggest that "distribution of funds through the use of *cy pres* is only proper where the [sic] 'it would be extremely difficult to distribute the funds *pro rata*.'"  Palmer Obj. at 9 (quoting *Powell v. Georgia Pacific Corp.*, 119 F.3d 703, 706 (8th Cir. 1997)).  The Objectors' arguments for a *pro rata* distribution fail for several reasons.

(1)      **A *pro rata* distribution to all class members is not possible because the identity of all class members is unknown and would be difficult to administer.**

To start, *pro rata* distributions are impossible because the identity of all class members is not known and, even if known, would be incredibly difficult to administer.  In the only controlling authority cited, *Powell v. Georgia Pacific Corp.*, 119 F.3d 703 (8th Cir. 1997), by the

Palmer Objectors, the class membership was known and involved only approximately 2,000

class members.  *Id*. at 706.  Even then, the *Powell* court found that the district court did not abuse

its discretion in approving *cy pres* distribution over a *pro rata* distribution "[b]ecause of the

difficulties inherent in administering a settlement involving a class of over 2,000 members

(particularly in light of the number of years that have passed since the original distribution),"

affording "the district court's determination … a great deal of deference."  *Id*.; *see also Shapira*

*v. City of Minneapolis*, No. 06-CV-02190-MJD-SRN, 2012 WL 1438813, at *1 (D. Minn. Apr.

26, 2012) ("*Cy pres* distribution is often used when class members cannot be easily identified or

located.  It is particularly appropriate when there are a large number of class members.").

        While not controlling, the decision relied upon by the Weinstein Objectors in making

their argument for *pro rata* distributions, *Klier v. Elf Atochem N. Am. Inc.*, 658 F.3d 468 (5th Cir.

2011), confirms this point.  There, the court encouraged distributions for money originally

designated for one subclass to be paid to another subclass where "still logistically feasible and

economically viable to make additional pro rata distributions," but found that it was "not

economically viable to distribute [approximately $830,000 in unclaimed] funds pro rata to the

12,657 members of Subclass B."  *Id.* at 475-76.

        Here, the difficulties with a *pro rata* distribution contemplated in *Powell* are magnified.

Not only is the complete identity of the class unknown, but it far exceeds the *Powell* class,

consisting of several million Milk Product consumers, a point unchallenged by Objectors.[13]  Like

with the approximately 2,000 class members in *Powell*, the class here far exceeds the 12,657

members in *Klier* with respect to whom the Court found it would not be economically viable to

---

        [13] Consistent with Plaintiffs' belief, Costco sent 2,783,143 e-mails and 2,030,011 postcards
to class members' addresses.  *See generally* Decl. Dan Ross (Dkt. # 332).

distribute residual funds.  Even the Objectors' own cases make clear that a *pro rata* distribution

is difficult and not viable, and their arguments for such should be rejected outright.

> **(2)** ***Pro rata* distribution only to class members submitting claims would not be appropriate.**

Second, the Weinstein Objectors offer an additional spin on their *pro rata* distribution

argument, asserting that any excess funds should be distributed *pro rata* to those "class members

who make claims."  Weinstein Obj. at 8.  This argument fails too.

Again, Objectors' own cases are instructive.  The Eighth Circuit in *Powell* affirmed a

district court's *cy pres* election over a *pro rata* distribution, determining that the court "correctly

found" that the money in the registry set up to pay claims to class members was "'unclaimed'

and that neither party has a legal right to it."  119 F.3d at 705-06.  *See also* 2 MCLAUGHLIN ON

CLASS ACTIONS § 8:15 (9th ed. 2013) ("Assuming a claim form was required for participation,

after class members present valid proofs of claim and receive the full payment due to them, those

who fail to present timely claims are deemed to have waived their entitlement to class funds, so

that the class has no further legal rights in the fund.  Courts have firmly rejected the suggestion

that class members with liquidated damages claims who file proper proofs of claim may collect

on a pro rata basis any portion of a settlement or damage award which remains unclaimed.")

(internal citations and quotations omitted).

In *Powell,* the parties settled a race discrimination class action, with the defendant

depositing money into the court's registry to settle the claims.  119 F.3d 704.  In the consent

decree settling the matter, "the parties agreed that the court should determine how to dispose of

any money remaining in the registry after distribution."  *Id*.  After funds were distributed, the

plaintiffs moved "to have the funds distributed directly to the class members," and a court

appointed special master agreed and "recommended that the court distribute the money to the

class members *pro rata*." *Id*. at 705.  However, the district court rejected both recommendations, classifying the "money remaining in the registry as 'unclaimed funds.'" *Id*.  In affirming the district court, the Eight Circuit did "not think that these provisions of the consent decree [*i.e.*, relating to money remaining in the registry after distribution] mean that the money at issue in this case is not "unclaimed." *Id*. at 706 (citing 2 H. NEWBERG AND A. CONTE, NEWBERG ON CLASS ACTIONS § 10.13 at 10-35 (3d ed. 1992) for its definition of "'unclaimed funds' as the balance of a class recovery remaining after individual distribution").  After noting that "neither party has a legal right to the unclaimed funds," that Eighth Circuit affirmed the district judge's decision to a *cy pres* distribution rather than a *pro rata* distribution.

In making their arguments for a *pro rata* distribution, the Weinstein Objectors again rely on the Fifth Circuit's decision in *Klier*.  However, *Klier* is factually distinguishable and in any event actually supports Plaintiffs' position here.  First, after recognizing that "[f]ederal district courts often dispose of ... unclaimed funds by making ... *cy pres* distributions," the Fifth Circuit found that the district court abused its discretion by ordering a *cy pres* distribution where the parties themselves did not contemplate such an arrangement, *i.e.*, where "the district court's decision to distribute the unused funds via *cy pres* finds no support in the text of the settlement documents."  658 F.3d at 476-77, 480.  *Cf. In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d at 934 ("We have recognized that a class action settlement is a private contract negotiated between the parties ... Rule 23(e) requires the court to intrude on that private consensual agreement merely to ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned.").  By contrast, the settlement documents reflect a *cy pres* distribution for unclaimed settlement funds

and applying the re-allocation as suggested by the Weinstein Objectors would likely be erroneous under the *Klier* decision.[14]

Furthermore, while the Fifth Circuit wrote that "[w]here it is still logistically feasible and economically viable to make additional pro rata distributions to class members, the district court should do so," it highlighted an exception: "where an additional distribution would provide a windfall to class members with liquidated-damages claims[15] that were 100 percent satisfied by the initial distribution." *Klier*, 658 F.3d at 475. Under the Settlement before this Court, the *cy pres* provision is triggered only after class members have received notice and an opportunity to file their claims, they have been paid, and money exists otherwise undistributed in the Settlement. However, depending on the number of products purchased by a class member, class members may already receive a full recovery,[16] a point ignored in the objections. Thus, any

---

[14] Other courts have recognized that *Klier* poses no bar to *cy pres* distributions where, as here, there is only one class involved and the Objectors' positions if accepted would result in ignoring the bargained-for settlement agreement. *See, e.g., In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011). As that court explained: "In contrast, there are no subclasses here, let alone unused money allocated to a subclass, and the Settlement Agreement explicitly and appropriately provides for *cy pres* distributions in light of the infeasibility of determining recipients. Objectors ask this Court to do precisely what the Fifth Circuit found to be error in *Klier* – ignore the Settlement Agreement and re-allocate the *cy pres* funds. This the Court will not do." *Id.* at 1357. Here, the Weinstein Objectors similarly ask this Court to ignore the Settlement Agreement and re-allocate the *cy pres* funds, and concomitantly ignore the fair, adequate, and reasonable bargained-for Settlement Agreement.

[15] The case here is factually distinguishable as this case does not involve liquidated damages, *i.e.*, damages in "[a]n amount contractually stipulated as a reasonable estimation of actual damages to be recovered by one party." *See generally Black's Law Dictionary* at 395 (7th ed. 1999). Here, Defendants continue to deny that any class member was damaged, let alone agreed to a liquidated damages figure. *See* Settlement Agreement, at 8-9 (§ I.Z.).

[16] Even at the lower end of the recovery, class members still receive 34% of alleged individual damages, which falls within the range of reasonableness approved by courts in granting final approval to class settlements. *See, e.g., In re BankAmerica Corp. Secs. Litig.*, 210 F.R.D. 694, 708 (E.D. Mo. 2002) ("[A] settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable, or inadequate."); *Holden v. Burlington N. Inc.*, 665 F. Supp. 1398, 1414 (D. Minn. 1987) ("A cash settlement amounting to only a fraction of the potential cash recovery (and the present proposed settlement is not such a recovery) does not in itself render the settlement unfair or inadequate. In fact there is no reason, at least in theory, why a satisfactory settlement

increase in the settlement amounts could otherwise result in a windfall.[17]  *Klier* provides no

solace to the Weinstein Objectors.  Their argument is misplaced at best and should be rejected.

> **b.    The Objectors' attacks on the proposed *cy pres* recipients should be overruled.**

Perhaps recognizing the weakness of their attacks on the validity of the *cy pres* provision,

the Weinstein and Palmer Objectors resort to an argument that the *cy pres* provision is not fair or

reasonable because of the specific *cy pres* recipients identified.  Weinstein Obj. at 9; Palmer Obj.

at 8-9.  Such arguments amount to no more than mere disagreement, which is plainly insufficient

to demonstrate that the Settlement as a whole is not fair, reasonable and adequate.  Additionally,

given the serial nature of their objections, it is highly likely that the Objectors here would still

drum up an objection as to ***any*** recipient identified.

Nevertheless, the *cy pres* recipients selected, Consumers Union and the Organic Farming

Research Foundation, fit within the confines of the Eighth Circuit's direction for selecting such

recipients:

> [I]t may be appropriate for a court to use *cy pres* principles to
> distribute unclaimed funds.  In such a case, the unclaimed funds

---

could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.") (internal citations and quotations omitted).

[17]  *See also In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 35 (1st Cir. 2012), *cert. denied*, 133 S. Ct. 338, 184 L. Ed. 2d 239 (2012) (citing *Klier* as support in rejecting appeal to *cy pres* provision in consumer settlement, and noting that court's "concern about overcompensating claimant class members at the expense of absent class members," and has rejected "the argument that claimants are entitled to receive a windfall of any unclaimed residual money regardless of whether they have already been compensated for their losses" since "[i]t is well accepted that protesting class members are not entitled to windfalls in preference to *cy pres* distributions") (citing *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d at 34-36)); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1076-77 (S.D. Tex. 2012) (approving settlement with *cy pres* provision:  "First, 'it is not possible to put those funds to their very best use: benefitting the class members directly,' because the vast majority of class members did not file claims, whether from lack of interest or the absence of losses.  The Agreement is organized so *cy pres* relief is triggered only after class members have ample opportunity to file claims.  *Cy pres* is the only way to avoid having the unclaimed funds – $998,075 – revert to Heartland, escheat to the government, or provide a huge windfall to the few who filed valid claims.") (quoting *Klier*, 658 F.3d at 475).

- 27 -

> should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated.

*In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 682 (8th Cir. 2002).[18]  This standard remains the law in the Eighth Circuit for evaluating a proposed *cy pres* distribution.  *See Shapira*, 2012 WL 1438813, at *2 (relying on *In re Airline Ticket* to approve *cy pres* distribution).

As explained in Plaintiffs' opening motion, each organization's work corresponds with the case's prevailing themes and underlying objectives.  Plaintiffs allege that that Defendants advertised that the Milk Products were produced using particular animal husbandry practices (*i.e.*, that the cows were placed in pasture, that they were fed solely an organic diet, and that they were not exposed to antibiotics and hormones), when these representations were not true.  It cannot be credibly disputed that a distribution to Consumers Union would be as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated, given that that organization's work in reporting on and monitoring the integrity of the national organic label program to ensure that consumers were consistently getting products that met their expectations.[19]  Likewise, the Organic Farming Research Foundation ("OFRF") fits within the Eighth Circuit's requirements.  Class members purchasing the Milk Products at issue in this lawsuit have an undeniable interest in ensuring that

---

[18] The Eighth Circuit has also suggested that district courts should "consider the full geographic scope of the case," reminding district courts to "'consider to some degree a broader nationwide use of its *cy pres* discretion'" for cases involving "a nationwide harm."  *In re Airline Ticket*, 307 F.3d at 683 (quoting *Houck v. Folding Carton Admin. Comm.*, 881 F.2d 494, 502 (7th Cir. 1989)).  The Objectors do not challenge the proposed *cy pres* recipients in this regard.

[19] Plaintiffs note that even the Objectors themselves appear to disagree on this point. Whereas, the Palmer Objectors concede that Consumers Union "could have some in direct [sic] relation to class members," but quarrel that the donation is not earmarked to effectuate the class members' purposes" Palmer Obj. at 9, the Weinstein Objectors declare simply that the *cy pres* award fails to satisfy the Ninth Circuit's requirements, without any attempt to apply the facts of this case to that law.  Weinstein Obj. at 9.

the products they purchase are organic.  Selection of OFRF as a *cy pres* recipient will help secure the availability of organic products to the class members.

While both sets of Objectors rely heavily on the Ninth Circuit's decision in *Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012), Lexis and Westlaw searches confirm that neither the Eighth Circuit nor courts within the Eighth Circuit have adopted *Dennis* as the law in this Circuit, let alone even cite that decision.[20]  Indeed, one recent decision suggests that the discretion granted to district courts in this circuit is broader.  *See Shapira*, 2012 WL 1438813, at *2 (citing the Eighth Circuit's requirements in *In re Airline Tickets,* then noting "[u]nder the broad equitable powers that underlie the distribution of *cy pres* funds, however, courts may distribute these funds to benefit a public interest, *even if that interest is unrelated to the plaintiff's original claims*") (emphasis added).  *See also Heekin v. Anthem, Inc.*, No. 1:05-CV-01908-TWP-TAB, 2012 WL 5472087, at *4 (S.D. Ind. Nov. 9, 2012) (approving settlement with *cy pres* provision over objection initially offered by Mr. Palmer:[21]  "Mr. Paul cites Ninth Circuit law that sets forth a standard for avoiding 'nascent dangers' that can arise in the settlement of class actions when *cy pres* awards are used.  The Ninth Circuit requires a *cy pres* award be 'guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members, and must not benefit a group too remote from the plaintiff class.'  The law in the Seventh Circuit is not so restrictive.") (quoting *Dennis*, 2012 WL 3800230, at *5).

---

[20] In any event, the proposed *cy pres* recipients would satisfy the *Dennis* requirements as well.  This case involves the marketing and sale of products that were represented to be raised using particular methods, but which allegedly were not.  The "nexus" is present here as the proposed *cy pres* recipients address the objectives of this case by working to ensure that organic products are available for purchase (OFRF) and educating and serving as a watchdog regarding consumer fraud issues generally and organic issues specifically (Consumers Union).  Moreover, given the nationwide sales of the products through major retailers, the proposed recipients are national in scope, thus benefitting class members throughout the country as opposed to benefitting only those living in certain parts of the country.

[21] *See infra* III.D.2 (discussing Mr. Palmer's of *pro hac vice* application in *Anthem*).

As a result, the Objectors attack on the proposed *cy pres* recipients should be denied.

**4.      Proof of purchase requirements, with caps on awards for those lacking flexible evidence, are permissible.**

Objector Dama, who refers to the reasons for his objection as "fairly trivial," focuses solely on the Settlement's provision that individuals without any receipts, but who file an attestation that they purchased the products, will receive up to $10 each.  Dama Obj. at 1 (Dkt. # 342).  However, the Settlement itself provides flexibility for what constitutes proof of purchase, and is not limited to receipts as Objector Dama contends.  Rather, in clarifying "[v]alid proof of purchase," it provides that  "[e]xamples may include but are not limited to store receipts, milk cartons, butter cartons or any other contemporaneous record of purchase that is objectively verifiable."  Settlement Agreement at 18.  Furthermore, in cases like this, where class member purchase records are not maintained for all class members, it is wholly appropriate to have "some mechanism for class members to demonstrate on an individual basis that they satisfy the criteria for participating in the class settlement benefits."  3 Newberg on Class Actions §9:72 (4th ed. 2010).  Default awards are permissible and are no basis for overturning a settlement as unfair or unreasonable.  *See* MANUAL FOR COMPLEX LITIGATION (FOURTH), § 21.66 (2004) ("A default award may be appropriate for those who can establish membership in the class but cannot, or prefer not to, submit detailed claims. Typically, such an award would be at the low end of the range of expected claims."); *Wilson v. Airborne, Inc.,* EDCV 07-770 VAP(OPX), 2008 WL 3854963, at *9 (C.D. Cal. Aug. 13, 2008) ("The Court also overrules the objections filed by Objector Walsh, who argues that the settlement is inadequate in limiting recovery for class members without proofs of purchase to the price of six boxes of Airborne.  This is essentially a dispute with the form of compromise Plaintiff and his counsel chose to accept by settling, and not a basis for deeming the settlement agreement's terms unfair or inadequate.") (internal citation

omitted).  Accordingly, the objections related to the use of the Court approved claim form, and the amount of default awards, are insufficient grounds to overturn the Settlement.

## C.     The Objections to the Requested Reasonable Attorneys' Fees Fail

The Palmer Objectors alone contend that the Settlement should be rejected because reasonableness of the attorneys' fees requested cannot be determined until "all claims are submitted and tallied."  Palmer Obj. at 11.   This objection should be rejected.

The common fund doctrine "reflects a traditional equitable practice and stands as a well-recognized exception to the general rule that each litigant must bear his attorneys' fees."  *In re Chrysler Motors Corp. Overnight Evaluation Program Litig.*, 736 F. Supp. 1007, 1012 (E.D. Mo. 1990) (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).  "Under the doctrine, it is well recognized that a lawyer who recovers a common fund for the benefit of others or his client is entitled to a reasonable attorney's fee from the fund."  *Id*. (citing *Boeing*, 444 U.S. at 478; *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975)).  This approach is used whether the case creates a "fund in hand" or a "fund available" to claimants.  As the United States Supreme Court has recognized, an attorney who recovers a common benefit is entitled to reasonable attorneys' fee from the fund as a whole, ***regardless of whether*** some class members fail to exercise their right to possession in the fund. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 480-82 (1980); *see also* 3 NEWBERG ON CLASS ACTIONS § 14.03, at 14-14 (3d ed. 1992) (same).

If an attorney were limited to "a fixed percentage of [a] judgment actually claimed, the resulting fee would be entirely dependent on the number of plaintiffs who came forward. Considerations of the difficulty of the case, the quality of representation, and the hours spent by the attorney, would not determine the ultimate size of the fee.  Nor can the attorney always determine whether it would be worthwhile for him to undertake the risks of litigation, for the

number of plaintiffs who will come forward after judgment is often unpredictable." *Van Gemert v. Boeing Co.*, 590 F.2d 433, 441 (2d Cir. 1978) (footnote omitted), *aff'd*, 444 U.S. 472 (1980). "The entire Fund, and not some portion thereof, is created through the efforts of counsel at the instigation of the entire class.  An allocation of fees by percentage should therefore be awarded on the basis of the total funds made available, whether claimed or not." *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d at 436-37 (citing *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295 (11th Cir. 1999); *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997)); *see also Shames v. Hertz Corp.*, No. 07-CV-2174-MMA(WMC), 2012 WL 5392159, at *10 (S.D. Cal. Nov. 5, 2012) (rejecting objection that Court "should wait until the claims are in, and it is determined how much was actually paid to the class before determining a reasonable percentage for class counsel"; Court could gauge the reasonableness of the fee award under percentage approach by "reasonably estimat[ing] the settlement value based on the terms agreed by the parties…. There is no need to wait until all class members have filed claims to award attorneys' fees.").  The $7.5M fund is the appropriate value against which a percentage should be applied.[22]  The Palmer Objectors cite no contrary authority.  The 33% requested is well in line with awards in similar cases.  *See* Dkt. # 333 at 11-13 (citing cases).[23]

---

[22] *See*, *e.g.*, *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996) (although under settlement agreement, attorney fees "technically derive from the defendant rather than out of the class' recovery, in essence the entire settlement amount comes from the same source …. Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery"); *Guschausky v. American Family Life Assur. Co.*, 851 F. Supp. 2d 1252, 1257-58 (D. Mont. 2012) ("The Common Fund Doctrine recognizes that the only way to equitably spread the attorney's fees across all the beneficiaries is to levy the attorney's fees against the common fund.  That does not imply, however, that the Common Fund Doctrine is inapplicable where, as here, attorney's fees are paid independently of the sum made available to the settlement beneficiaries.").

[23] The percentage is based on the monetary amount paid into the fund by Aurora.  The benefits of the settlement, however, also include the injunctive relief, which obligates Aurora to continue adherence to specified organic production practices for three years, with yearly reports and independent monitoring.  Where a class settlement includes substantial affirmative relief, it is "important to take [that relief] into account" also.  *Will v. General Dynamics Corp.*, No. 06-

The fee requested by Class Counsel is supported not just by the percentage method, but also the lodestar method.  *See* Dkt. # 333 at 13-17. Plaintiffs' Counsel reported an aggregate of 12,073.05 hours rendering services to Plaintiffs in this litigation.  Ex. 2-27.  When the number of hours is multiplied by the regular rate per hour of each attorney and paraprofessional, the amount of the lodestar equals a total $5,215,978.74.  *Id.* at 16.  The negative multiplier, at .48, produced by cross-checking the 33.3% requested award against the lodestar of $5,215,978.74 is well below the accepted range in similar class cases.  *Id.* at 16-17 (citing cases).  This also supports the reasonableness of the fee request here.  The Palmer Objectors cite nothing to the contrary.

## D.    Miscellaneous Procedural Issues

### 1.    The Palmer Objections are deficient under plain language of Court's order.

The Palmer Objections fail to follow the plain directives of the Court's Preliminary Approval Order and should be stricken on that ground.[24]  Among other information, the Preliminary Approval Order unambiguously requires:

> [A] statement of the objection signed by the Settlement Class Member containing all of the following information:
>
> a.    The objector's full name, address, and telephone number;
>
> b.    A description of the Milk Products the objector purchased including to the extent possible the type, brand name and number of Units of Milk Products purchased, the price(s) paid, the date(s) and location(s) of the purchase(s), and the name(s) of the retail location(s) where the purchase(s) were made; [and]

---

698-GPM, 2010 WL 4818174, at *1, 4 (S.D. Ill. Nov. 22, 2010) (citing MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.71, at 337 (2004); PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION, § 3.13)).

[24] The Eighth Circuit has stressed the importance of following the procedures for lodging objections.  In *In re UnitedHealth Group Inc. S'holder Derivative Litig.*, 631 F.3d 913 (8th Cir. 2011), the Eighth Circuit reviewed an untimely objection.  The Eighth Circuit held "that – at a minimum – a shareholder must file a timely and proper objection with the district court before appealing a settlement agreement," adding "[a] shareholder – or an unnamed class member for that matter – must file a timely objection pursuant to district court procedure, or else he loses any right he would have otherwise had to appeal a settlement agreement."  *Id.* at 917.

> c.    A copy of any Valid Proofs of Purchase of the items
> described in subparagraph 16(b).

Preliminary Approval Order, ¶ 16.[25]  The Palmer Objectors did not provide any of this

information.  *See generally* Dkt. # 337.  Instead, the Palmer Objectors allege simply "that they

are Class Members, qualified to make a claim for the proposed relief" and "purchased one or

more of the subject products from one or more of the named retailers."  *Id.* at 1.  The failure to

provide such basic information renders the Palmer Objection subject to outright dismissal by the

Court.  *See* Preliminary Approval Order, ¶ 18 ("The Court orders that any Settlement Class

Member who does not file a timely written objection to the Settlement *or who fails to otherwise*

*comply with the requirements of Paragraph 16 of this order* shall be foreclosed from seeking any

adjudication or review of the Settlement by appeal or otherwise.") (emphasis added).  This

failure renders the Palmer Objection suspicious.  At least one case reports that objections filed by

Mr. Palmer have been lodged by people who were not members of a settlement class.  In *In re*

*Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.*, the court found "that the Palmer

Objectors have evidenced bad faith and vexatious conduct," noting "*[m]ost critically, the Palmer*

*Objectors are not class members*," since "the photograph of the allegedly faulty pipe fitting in

the Palmer residences reveals that their pipe fittings are HLPEX systems, a pipe fitting not

involved in this litigation."  2012 WL 3984542, at *3 (emphasis added).

## 2.    Mr. Palmer is not fit to appear before the Court.

Finally, Mr. Palmer should not be permitted to appear before this Court, having been

rebuked by multiple other federal district courts.  *See generally*, *Shaw,* 91 F. Supp. 2d at 974-75

---

[25] *See Shaw v. Toshiba Am. Info. Sys.*, 91 F. Supp. 2d 942, 974-75 (E.D. Tex. 2000) (admonishing objector's counsel after standing issues were raised by class counsel, "which, in turn, raised serious questions about his submissions"); 4 NEWBERG ON CLASS ACTIONS § 11:56 (4th ed. 2002) ("[T]o prevent spurious objections…the majority of settlements include a mandatory procedure which objectors must follow if their objections are to be considered.").

(while the court serves as a "'guardian' of the class," "it is also the guardian of the judicial

system's integrity," and "[a]n objector … cannot expect this Court to abandon one role for the

other"). In *Herfert v. Crayola, LLC*, the court denied Mr. Palmer's application:

> Mr. Palmer is denied for failure to appear at a prior hearing and for
> material nondisclosures in his application. Mr. Palmer falsely
> declared under penalty of perjury that he had not been disbarred or
> formally censured by a court of record or by a state bar association.
> (Dkt. No. 59). In fact, Mr. Palmer was temporarily suspended
> from the Colorado Bar Association, the State Bar of Arizona, and
> the State Bar of California as a result of a Colorado felony
> conviction. Mr. Palmer has submitted a letter to the Court
> attributing his failure to disclose these suspensions to an oversight
> on the part of his assistant. Any professional should know better
> than to blame his assistant for such a serious misstatement in a
> document containing his own signature. The Court relies on an
> attorney's signature as his personal attestation that the information
> submitted is true and complete. It was Mr. Palmer's responsibility,
> and his alone, to ensure the accuracy of his application.

Order Denying Application of Claimant's Counsel Darrell Palmer to Appear Pro Hac Vice

(W.D. Wash. August 17, 2012) (Kurowski Decl., Ex. 5). Similarly, in another case pending in

the Western District of Washington, *Arthur v. Sallie Mae*, the Court revoked Palmer's *pro hac*

*vice* admission, characterizing Palmer's conduct before that Court as "unacceptable." Hearing

Tr. at 9 (Kurowski Decl., Ex. 6). The court explained:

> Mr. Palmer was alerted to the problem when his pro hac vice
> application in Judge Coughenour's case was challenged. That was
> on October 10, 2012 (*sic*). Mr. Palmer did not immediately raise
> and seek to correct the same mistake in this case. In fact, plaintiffs
> waited ten days before filing their motion to give Mr. Palmer time
> to raise and correct the issue.
>
> Mr. Palmer did not file an amended pro hac vice application until
> August 27, 2012, a full 17 days after being notified of the problem.
> This does not demonstrate candor with the court or that he took
> seriously the fact that he made a false statement under oath.
> Additionally, Mr. Palmer has apparently submitted false pro hac
> vice applications in at least three other cases. As a final note, the
> false statement in the pro hac vice application is not the only
> misrepresentation Mr. Palmer has made to this court. It is
> impossible to reconcile a declaration submitted to this court under
> penalty of perjury, dated May 17, 2012, with the court record. And
> Mr. Palmer has now acknowledged that it is incorrect. That serves
> as the basis for his fee application in this matter. As will be further

> discussed today, Mr. Palmer made several other misrepresentations in his motions for attorneys' fees. These misrepresentations confirm my conclusion that the court sanction Mr. Palmer by revoking his admission in this case. Therefore, Docket 251 is granted, and Mr. Palmer's pro hac vice is revoked.

*Id.* Further, in *Ormond v. Anthem, Inc.*, No. 05-cv-1908 (S.D. Ind.), Mr. Palmer filed a *pro hac vice* application to appear on behalf of objector Edwin Paul and Judy Paul (Dkt. # 747, filed Sept. 17, 2012), but subsequently withdrew his application. *See* Docket in *Ormond v. Anthem, Inc.* (Kurowski Decl., Ex. 7). The docket in that case confirms that after Mr. Palmer filed his *pro hac vice* application, the court scheduled a status conference to "address the motion to appear pro hac vice of attorney Joseph Darrell Palmer." *See id.* at Dkt. # 752 (Sept. 25, 2012). Notably, when class counsel submitted the orders in *Crayola* and *Sallie Mae*, respectively denying and revoking Mr. Palmer's admissions (Dkt. # 753), Mr. Palmer withdrew his *pro hac vice* application two days later. Dkt. # 754. Accordingly, Mr. Palmer's appearance on behalf of the Palmer Objectors should not be permitted.

## IV.   CONCLUSION

Accordingly, for the reasons provided above, and in their opening Motions, Plaintiffs respectfully request that the Court grant final approval, certify the class as requested, and grant Plaintiffs an award of reasonable attorneys' fees and expenses. Plaintiffs request all such other relief as the Court deems necessary and appropriate.

010004-17 585821 V1

Dated:  February 19, 2013    By: /s/ Elizabeth A. Fegan    
              Elizabeth A. Fegan
            Daniel J. Kurowski
            HAGENS BERMAN SOBOL SHAPIRO LLP
            1144 W. Lake Street, Suite 400
            Oak Park, IL  60301
            Telephone:  (708) 628-4949
            Facsimile:  (708) 628-4950

            By: /s/ Don M. Downing    
              Don M. Downing
            Gretchen Garrison
            Thomas Neill
            GRAY, RITTER & GRAHAM, P.C.
            701 Market Street, Suite 800
            St. Louis, MO  63101-1826
            Telephone:  (314) 241-5620
            Facsimile:  (314) 241-4140

            *Interim Co-Lead Counsel for Plaintiffs*

010004-17 585821 V1

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on February 19, 2013, a true and

correct copy of the foregoing, together with all attachments thereto, was filed electronically via

CM/ECF, which caused notice to be sent to all counsel of record.

/s/ Elizabeth A. Fegan

010004-17 585821 V1